IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-00258-01-CR-W-DGK |
| | ) | |
| LUIS F. GASTELUM-CASTRO, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant's Motion for Suppression of Evidence Statements Waivers and Electronic Data (doc #32). For the reasons set forth below, it is recommended that the motion be granted in part and denied in part.

I. BACKGROUND

On August 23, 2012, a criminal complaint was filed against defendant Luis F. Gastelum-Castro charging that on October 5, 2010, defendant knowingly possessed with intent to distribute 500 grams or more of cocaine.

On September 4, 2012, the Grand Jury returned a five-count indictment against Luis F. Gastelum-Castro, Julio A. Gastelum-Castro, Andres Martinez-Lopez and Daniel Perez.[1] Count One of the indictment charges that between August 24 and October 5, 2010, all defendants knowingly conspired with others to distribute 50 grams or more of methamphetamine and 500 grams or more of cocaine. Count Two charges that on October 5, 2010, all defendants, aiding and abetting each other, knowingly distributed and possessed with the intent to distribute 50 grams or

---

[1] There are outstanding arrest warrants for Julio A. Gastelum-Castro, Andres Martinez-Lopez and Daniel Perez.

more of methamphetamine. Count Three charges that on October 5, 2010, all defendants, aiding and abetting each other, knowingly distributed and possessed with the intent to distribute 500 grams or more of cocaine. Count Four charges that on August 1, 2012, defendant Luis F. Gastelum-Castro, an alien who had been previously deported and removed from the United States on October 20, 2010, was found in the United States without having obtained the consent of the Attorney General/Homeland Security Director of the United States to reapply for admission into the United States. Count Five charges that on October 5, 2010, defendants Luis F. Gastelum-Castro, Julio A. Gastelum-Castro and Andres Martinez-Lopez were found in the United States after having entered the United States at a location or time not designated by immigration officials.

An evidentiary hearing on the motion to suppress was begun on December 7, 2012, and concluded on February 5, 2013. Defendant Luis F. Gastelum-Castro was represented by retained counsel Raul Mendez.[2] The Government was represented by Assistant United States Attorney Sydney N. Sanders. On December 7, 2012, the Government called Special Agent Mark R. King of Immigration and Customs Enforcement, Homeland Security Investigations as a witness. On February 5, 2013, the cross-examination of Special Agent King was concluded. The Government then called Officer Alejandro Cerda of the Olathe, Kansas Police Department[3] as a witness. The defense called Roxanne Martinez, defendant Luis F. Gastelum-Castro's girlfriend, to testify. The defense also offered into evidence a videotape (Defendant's Ex. 81) and transcript of defense counsel's interview of co-defendant Julio A. Gastelum-Castro, Luis F. Gastelum-Castro's brother,

---

[2]Thomas R. Fields also appeared for part of the hearing held on December 7, 2012, as local counsel.

[3]During the time period relevant to the motion to suppress, Officer Cerda was a detective in the Investigations Unit - Gang Squad of the Kansas City, Missouri Police Department. (Transcript of the February 5, 2013 Hearing ("Tr. II") at 56)

which interview took place in Mexico on January 11, 2013.[4]

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On October 5, 2010, Special Agent King received information from a confidential source, who had proven reliable in the past, that a shipment of illegal narcotics had arrived in Kansas City and was going to be unloaded. (Transcript of the December 7, 2012 Hearing ("Tr. I") at 8-9) The confidential source stated that there was a white Tahoe in the 1200 block of Bales and that the persons in that vehicle were involved in this shipment of illegal narcotics. (Tr. I at 10) The confidential source further stated that Mexican males were involved and that they were possibly illegally in the United States. (Tr. I at 12) Special Agent King contacted Detective James Armstead with the Gang Unit of the Kansas City, Missouri Police Department and passed the information along to him at approximately 1:45 p.m. (Tr. I at 9-10) Special Agent King contacted Detective Armstead because King is assigned to the Gang Unit and works closely with Armstead. (Tr. I at 9) Detective Armstead's office is not far from the 1200 block of Bales so he responded to the area first. (Tr. I at 10)

2. Detective Armstead and his partner, Detective Alejandro Cerda, established surveillance in the 1200 block of Bales and located a white Tahoe. (Tr. I at 11; Tr.

---

[4] After the hearing, defense counsel provided supplemental briefing regarding the videotape and transcript. (See Supplemental Declaration and Memorandum in Support of Motion to Suppress (doc #54)) Basically, defendant argues that the interview should be admitted into evidence as the government is not protected by the Sixth Amendment Confrontation Clause and hearsay is admissible at a suppression hearing. Defendant is correct in stating that the Confrontation Clause protects only the accused, but the hearsay rules may be invoked by the government as well as the defendant and "[t]he use of *ex parte* depositions is … barred in criminal proceedings." See United States v. Flores, 985 F.2d 770, 781 (5th Cir. 1993). While a "court may accept hearsay evidence at a suppression hearing if the court is satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness," see United States v. Maza, 93 F.3d 1390, 1396 (8th Cir. 1996)(quoting United States v. Boyce, 797 F.2d 691, 693 (8th Cir. 1986)), this Court has serious doubts about the truthfulness of statements made by fugitive Julio Gastelum-Castro that exonerate his co-defendant brother and which were given during an *ex parte* deposition in Mexico. Further, unlike the statement offered in United States v. Paguio, 114 F.3d 928 (9th Cir. 1997), a case presented by defendant in support of admission, Julio Gastelum-Castro's statement cannot be admitted into evidence by means of the absent witness hearsay exception for statements against penal interest as Julio Gastelum-Castro did not make any statements against penal interest. Thus, the videotape and transcript of defense counsel's interview of Julio Gastelum-Castro will not be admitted into evidence.

3

II at 58)  The detectives followed the white Tahoe to 2100 Kansas Street. (Tr. I at 11; Tr. II at 59)  The white Tahoe returned to Bales and then went back to 2100 Kansas Street. (Tr. I at 11; Tr. II at 59-60)  Special Agent King and his partner, Special Agent Brent Yoshikawa, responded to 2100 Kansas Street at approximately 2:15 p.m. (Tr. I at 10-11; Tr. II at 60)  The detectives told Special Agent King that they had observed two men come out of 2100 Kansas Street carrying a toolbox, drive to the 1200 block of Bales and then back to 2100 Kansas Street. (Tr. I at 11)  Special Agent King contacted Sergeant Jay Pruetting of the Gang Squad and it was decided that the officers would just continue to conduct surveillance and wait until somebody came out of the house. (Tr. I at 11-12; Tr. II at 25)

3. At approximately 3:25 p.m., three subjects came out of the house at 2100 Kansas Street. (Tr. I at 12; Tr. II at 60)  Detectives Armstead and Cerda approached two of the subjects who went to the white Tahoe. (Tr. I at 12)  Detective Cerda identified himself in both English and Spanish. (Tr. II at 61)  Detective Cerda is fluent in the Spanish language. (Tr. II at 57)  Detective Cerda asked the subject on the passenger's side of the vehicle for his name and the subject identified himself as Daniel Perez. (Tr. II at 61)  Detective Cerda asked Perez if he could search him. (Tr. II at 62)  Perez consented to be searched. (Tr. II at 62)  Detective Cerda found a white powdery substance, later determined to be cocaine, in a clear plastic baggie in Perez' pocket. (Tr. II at 63)  Detective Cerda placed Perez under arrest for possession of a controlled substance. (Tr. II at 63)  Detective Cerda then spoke to the other subject, later identified as Julio Gastelum-Castro.[5] (Tr. II at 63)  Detective Cerda asked to search Julio Gastelum-Castro and then asked whose house it was. (Tr. II at 63)  Julio Gastelum-Castro said it was his house. (Tr. II at 64)  Detective Cerda asked Julio Gastelum-Castro about the third man who was going back inside the residence. (Tr. II at 64)  Julio Gastelum-Castro said nothing. (Tr. II at 64)  Detective Cerda asked Julio Gastelum-Castro if they could go inside and speak and Julio Gastelum-Castro agreed. (Tr. II at 64)  Detective Cerda testified that Julio Gastelum-Castro was not under arrest nor was he handcuffed. (Tr. II at 64)

4. As Detectives Armstead and Cerda approached the two subjects who had walked to the white Tahoe, Special Agents King and Yoshikawa approached the third subject who was returning to the residence. (Tr. I at 12)  When he reached the third subject at the front door of the residence, Special Agent King identified himself as an agent with Immigration and Customs Enforcement, explained that the officers were conducting a narcotics investigation and asked the subject if he lived at the residence. (Tr. I at 12)  Special Agent King characterized the encounter as being similar to a knock and talk. (Tr. II at 41)  Special Agent King spoke to the subject in Spanish. (Tr. at 12)  Special Agent King testified that he is able to effectively communicate in the Spanish language. (Tr. I at 8)  Special Agent King further testified that the majority of the investigations he conducts which relate to the

---

[5] Julio Gastelum-Castro initially identified himself as Omar Carrillo. (Tr. I at 18; Tr. II at 89)

4

importation of controlled substances involve Mexicans who are illegal aliens in this country. (Tr. I at 12) Even if the subjects do speak English, most of the time they will indicate that they do not speak English, so Special Agent King has found it easier just to speak with them in their native language. (Tr. I at 12-13) The subject at the front door was subsequently identified as Andres Martinez-Lopez. (Tr. I at 13) Martinez-Lopez told Special Agent King that he did not live at the residence. (Tr. I at 13)

5. Detectives Armstead and Cerda joined Special Agents King and Yoshikawa and Andres Martinez-Lopez with the two subjects (Daniel Perez and Julio Gastelum-Castro) who had walked to the Tahoe. (Tr. I at 13) Detective Cerda advised that Julio Gastelum-Castro had indicated that this was his residence and that he had given the officers permission to go inside the house. (Tr. I at 14; Tr. II at 64-65)

6. Special Agents King and Yoshikawa entered the residence. (Tr. I at 14) The officers conducted a protective sweep of the residence for officer safety, looking for other persons in the residence. (Tr. I at 15) Special Agent King testified that it was his understanding that he had permission to go in and conduct a protective sweep. (Tr. II at 28) The officers located Luis Gastelum-Castro[6] in a basement room, asleep on a mattress. (Tr. I at 15) Several articles of clothing belonging to Luis Gastelum-Castro were found in the basement room. (Tr. II at 111) Luis Gastelum-Castro was brought out of the residence to the front porch. (Tr. I at 15-16) Luis Gastelum-Castro was not handcuffed. (Tr. I at 65) During the protective sweep, the officers observed narcotics in plain view. (Tr. I at 15) At the foot of the mattress where Luis Gastelum-Castro was sleeping, the officers observed a black trash bag with crystal meth lying out to dry. (Tr. I at 15) Special Agent King testified that a lot of time crystal methamphetamine will show up in a wet form and it has to be dried before it is distributed. (Tr. I at 19) Special Agent King testified that the crystal meth that was drying on the trash bag was not a personal use amount. (Tr. I at 20) There were also three plastic baggies in plain view containing crystal methamphetamine and a kilo brick of cocaine on the table in the basement room where Luis Gastelum-Castro had been sleeping, as well as a scale on the floor and a scale on the table. (Tr. I at 15-16)

7. Once it was determined that no one else was in the house, the Special Agents retreated from the house and everyone was on the front porch. (Tr. I at 16) The only person under arrest at that time was Daniel Perez. (Tr. I at 17; Tr. II at 84) The officers were deciding whether they would seek a search warrant or a consent to search the residence. (Tr. I at 16) The officers decided to seek consents from both Julio Gastelum-Castro, because he had indicated that it was his residence, and Luis Gastelum-Castro, because he had been found inside the residence on the mattress in the basement. (Tr. I at 16) Detective Cerda, who is fluent in the

---

[6]Luis Gastelum-Castro initially identified himself as Gustavo Castro. (Tr. I at 16; Tr. II at 89)

5

Spanish language, presented a written consent to search form to Julio Gastelum-Castro and Luis Gastelum-Castro. (Tr. I at 16-17) Detective Cerda read the consent form, which was written in Spanish, to Julio Gastelum-Castro and Luis Gastelum-Castro. (Tr. II at 66) Neither Julio Gastelum-Castro nor Luis Gastelum-Castro asked any questions about the consent form. (Tr. I at 17) Neither Julio Gastelum-Castro nor Luis Gastelum-Castro indicated to Detective Cerda that they did not understand the form or what Cerda was requesting. (Tr. II at 66) Both Julio Gastelum-Castro and Luis Gastelum-Castro signed the consent to search form at 3:30 p.m. (Tr. I at 16 and 82; Tr. II at 66-68; Government's Ex. 1) Detective Cerda testified that while Julio Gastelum-Castro and Luis Gastelum-Castro were handcuffed at this time, they were not under arrest. (Tr. II at 94-95 and 100) The form provided consent to members of the Kansas City, Missouri Police Department to search the residence. (Tr. I at 112; Tr. II at 96) Special Agent King is assigned to the Kansas City, Missouri Police Department Gang Squad. (Tr. I at 112)

8. The officers searched the residence. (Tr. I at 18) In the basement room where Luis Gastelum-Castro had been found sleeping, officers found methamphetamine on a black trash bag, three plastic bags containing crystal methamphetamine, a scale on the floor, a scale on the table and a kilo brick of cocaine on the table. (Tr. I at 18) Officers also found packaging materials, baggies, plastic wrap and paperwork with the name Omar Carrillo. (Tr. I at 18) In the master bedroom, officers found a safe containing two guns and ammunition and magazines for the guns. (Tr. I at 18) Finally, the officers found another kilo of cocaine and a pound of crystal methamphetamine underneath the white Tahoe in the driveway. (Tr. I at 18 and 20)

9. After the search of the residence, all four of the subjects were placed under arrest for possession of methamphetamine and cocaine. (Tr. I at 23-24) They were transported to the Kansas City, Missouri Police Department lockup. (Tr. I at 23) Special Agent King and Detective Cerda interviewed all four subjects later that day. (Tr. I at 24) The first interview (Daniel Perez) took place around 6:00 p.m. (Tr. I at 24) Perez advised that Julio Gastelum-Castro had thrown the kilo of cocaine and pound of meth underneath the Tahoe when he saw the police approaching. (Tr. I at 25) Perez further advised that Julio Gastelum-Castro trafficked illegal narcotics and that his primary customer was a man named Chepe at Olivarez Auto Repair. (Tr. I at 26)

10. Special Agent King and Detective Cerda then interviewed Julio Gastelum-Castro. (Tr. I at 26) Julio Gastelum-Castro was presented with and signed a <u>Miranda</u> waiver form which was written in Spanish. (Tr. I at 27-29; Government's Ex. 4) Julio Gastelum-Castro gave his home address as 2100 Kansas, Kansas City, Missouri. (Tr. I at 30; Tr. II at 76-77; Government's Ex. 5)

11. Next, Special Agent King and Detective Cerda interviewed Luis Gastelum-Castro.

6

(Tr. I at 30) Luis Gastelum-Castro was presented with and signed a Miranda waiver form which was written in Spanish. (Tr. I at 30; Government's Ex. 2) Luis Gastelum-Castro gave his home address as 3310 Highland, Kansas City, Missouri. (Tr. I at 30; Tr. II at 77; Government's Ex. 3) Luis Gastelum-Castro told Special Agent King that he lived at 3310 Highland with Andres Martinez-Lopez, Andres' mother and a younger sister. (Tr. I at 31) Luis Gastelum-Castro stated that he had stayed at Martinez-Lopez' house the previous night, that is October 4, 2010. (Tr. I at 31)

12. Finally, Special Agent King and Detective Cerda interviewed Andres Martinez-Lopez. (Tr. I at 31) Martinez-Lopez was presented with and signed a Miranda waiver form. (Tr. I at 31; Government's Ex. 6) Martinez-Lopez gave his address as 3310 Highland Avenue, Kansas City, Missouri. (Tr. I at 36; Government's Ex. 7)

13. On October 7, 2010, Special Agent King spoke to Andres Martinez-Lopez again. (Tr. I at 36) Martinez-Lopez had been the subject of a DEA investigation and the DEA had an arrest warrant for him. (Tr. I at 36) When DEA agents came to interview Martinez-Lopez and take him into custody, Martinez-Lopez advised that he wanted to talk to Special Agent King. (Tr. I at 36-37) Special Agent King spoke with Martinez-Lopez about the drugs that were seized at 2100 Kansas on October 5, 2010. (Tr. I at 37) Martinez-Lopez said that he had been distributing methamphetamine at the instruction of Julio Gastelum-Castro, who had been deported from the United States. (Tr. I at 37) Martinez-Lopez further stated that Luis Gastelum-Castro had been bringing shipments of methamphetamine to Kansas City and that in the one-month period leading up to October 5, 2010, Luis Gastelum-Castro had brought two-pound quantities of methamphetamine from Washington to Kansas City on two occasions. (Tr. I at 38-39) According to Martinez-Lopez, Luis Gastelum-Castro had also brought the meth and cocaine that were seized on October 5 and Luis Gastelum-Castro had instructed Martinez-Lopez to take the drugs out of a false compartment in a blue Ford Focus which was parked in the garage. (Tr. I at 39) Martinez-Lopez said there was no money in the house because Luis Gastelum-Castro had taken the money they had made from selling drugs to Washington to buy the drugs that were seized on October 5, 2010. (Tr. I at 39) After speaking with Special Agent King, Martinez-Lopez was arrested by the DEA and charged in a federal case. (Tr. I at 39)

14. Daniel Perez was released. (Tr. I at 39) Julio Gastelum-Castro and Luis Gastelum-Castro were deported from the United States prior to any charges being lodged. (Tr. I at 39)

15. At some point in late 2011 or early 2012, Special Agent King and Detective Ed Caballero with the Kansas City, Missouri Police Department Gang Unit received information that Luis Gastelum-Castro was back in the Kansas City area and that he was involved in drug trafficking. (Tr. I at 40)

7

16. Special Agent King and Detective Ed Caballero arrested Luis Gastelum-Castro on August 1, 2012, after conducting surveillance at Olivarez Auto Repair. (Tr. I at 43-44) Luis Gastelum-Castro was arrested on an immigration violation. (Tr. I at 44)

17. Roxanne Martinez, Luis Gastelum-Castro's girlfriend, testified that Luis Gastelum-Castro had an unstable living arrangement in October 2010. (Tr. II at 122-23) At times, Luis Gastelum-Castro stayed with Martinez at her parents' home, sometimes with his brother, at times with his friends and at times he would rent a hotel room. (Tr. II at 123 and 127) When Luis Gastelum-Castro stayed with his brother, he stayed in the basement at 2100 Kansas. (Tr. II at 125-26) Martinez testified that Luis Gastelum-Castro had a key to the front door of the residence and that he walked around the home freely as if it were his. (Tr. II at 126-27) According to Martinez, Luis Gastelum-Castro stayed at his brother's house a couple of days a week. (Tr. II at 127)

## III. DISCUSSION

Defendant Luis Gastelum-Castro seeks to suppress all evidence and statements. Specifically, defendant argues:

- The agents lacked consent or lawful authority to conduct a protective sweep of the residence.

- Defendant's consent to search was not voluntary.

- There was an illegal search of electronic media.

- Because the Kansas City, Missouri Police Department worked as a team with federal agents from the Immigration and Customs Enforcement, Homeland Security Investigations, the search and seizure was tainted beyond repair.

The government argues that defendant Luis Gastelum-Castro lacks standing to challenge the search of the residence. The Court will address each of the parties' arguments.

A. Standing

"Because Fourth Amendment rights are personal and may not be asserted vicariously, we must first determine whether [defendant] had a legitimate expectation of privacy in the area

8

searched or the item seized." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994)(citing Rakas v. Illinois, 439 U.S. 128, 138-44 (1978)). The Gomez court continued:

> If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally. The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched. Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Id. (citations omitted) In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court explained its findings in an earlier case, Jones v. United States, 362 U.S. 257 (1960),[7] and concluded that "Jones on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." Rakas, 439 U.S. at 142. The facts of the Jones case were set forth in Rakas as follows:

> In Jones, petitioner was present at the time of the search of an apartment which was owned by a friend. The friend had given Jones permission to use the apartment and a key to it, with which Jones had admitted himself on the day of the search. He had a suit and shirt at the apartment and slept there "maybe a night," but his home was elsewhere. At the time of the search, Jones was the only occupant of that apartment because the lessee was away for a period of several days.

439 U.S. at 141. The Rakas court explained that "Jones had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his 'interest' in those premises might not have been a recognized property interest at common law." 439 U.S. at 143.

---

[7]To the extent that Jones provided an automatic standing rule, Jones was later overruled on this ground by United States v. Salvucci, 448 U.S. 83 (1980).

9

While defendant Luis Gastelum-Castro gave his home address as 3310 Highland, Kansas City, Missouri, and stated that he had stayed at 3310 Highland the previous night (see Fact No. 11, supra), there were other facts that tied Luis Gastelum-Castro to the residence at 2100 Kansas and suggested that he had a reasonable expectation of privacy in the area searched. For instance, officers found Luis Gastelum-Castro asleep on a mattress in a basement room of 2100 Kansas on the afternoon of October 5, 2010. (See Fact No. 6, supra) Several articles of clothing belonging to Luis Gastelum-Castro were found in the basement room. (Id.) The basement room in which Luis Gastelum-Castro was found sleeping is the room that contained crystal meth lying out to dry, additional crystal meth in baggies, a brick of cocaine and two scales. (Id.) Roxanne Martinez, Luis Gastelum-Castro's girlfriend, testified that Luis Gastelum-Castro had an unstable living arrangement in October 2010, but that he sometimes stayed with his brother. (See Fact No. 17, supra) When Luis Gastelum-Castro stayed with his brother, he stayed in the basement at 2100 Kansas. (Id.) Martinez testified that Luis Gastelum-Castro had a key to the front door of the residence and that he walked around the home freely as if it were his. (Id.) According to Martinez, Luis Gastelum-Castro stayed at his brother's house a couple of days a week. (Id.)

The Court finds that defendant Luis Gastelum-Castro has met his burden of proving a reasonable expectation of privacy in the premises he was using, that is the basement room. Thus, defendant Luis Gastelum-Castro has standing to challenge the search. However, as set forth below, the Court finds that no constitutional violation took place with respect to the search.

B. Protective Sweep

On October 5, 2010, officers received information from a confidential source that a shipment of illegal narcotics had arrived in Kansas City, that Mexican males who were possibly illegally in the United States were involved in this shipment and that these persons could be found

in a white Tahoe in the 1200 block of Bales. (See Fact No. 1, supra) Officers conducted surveillance in the 1200 block of Bales, located a white Tahoe and followed the white Tahoe to 2100 Kansas Street. (See Fact No. 2, supra) Officers approached three subjects who came out of the house at 2100 Kansas Street at approximately 3:25 p.m. on October 5, 2010. (See Fact No. 3, supra) The encounter was similar to a knock and talk.[8] (See Fact No. 4, supra) One of the subjects, Julio Gastelum-Castro, when asked whose house it was, advised that it was his house. (See Fact No. 3, supra) When asked if the officers could go inside and speak to him, Julio Gastelum-Castro agreed.[9] (Id.) There was nothing improper in the manner in which the officers gained access to the residence.

In Maryland v. Buie, 494 U.S. 325, 335 (1990), the Supreme Court held that a protective sweep in conjunction with an in-home arrest is permissible if it is a quick and limited search, conducted for the purpose of safety and narrowly confined to a cursory visual inspection of spaces where a person may be found. The Court stated:

> [T]he Fourth Amendment would permit [a] protective sweep ... if the searching

---

[8] A knock and talk is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search. See United States v. Wise, 588 F.3d 531, 534 n.3 (8th Cir. 2009). The Eighth Circuit has acknowledged that a knock and talk is a reasonable investigative technique. See United States v. Weston, 443 F.3d 661, 667 (8th Cir.), cert. denied, 549 U.S. 956 (2006).

[9] Defendant contends that Julio Gastelum-Castro's consent to enter his home was not voluntary. (Motion for Suppression of Evidence Statements Waivers and Electronic Data (doc #32) at 5) However, the facts before the Court are that Julio Gastelum-Castro, who was 36 years old at the time, was not under arrest nor was he handcuffed when Detective Cerda asked if they could go inside and speak. (See Indictment (doc #8); Fact No. 3, supra) While Daniel Perez had been placed under arrest, the arrest was for possession of a controlled substance that was found in his pocket. (See Fact No. 3, supra) This possession put Daniel Perez in a different situation than Julio Gastelum-Castro, who had no controlled substance on his person. No evidence was presented to indicate that Julio Gastelum-Castro was threatened. Contrary to defense counsel's argument, no evidence has been presented that would suggest that Julio Gastelum-Castro's consent for officers to enter his residence was not voluntary.

11

> officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

Id. at 327 (citations omitted). The protective sweep doctrine has been expanded beyond in-home arrests to other situations where officers are lawfully present in a home. See United States v. Legette, 260 Fed. Appx. 247, 249-50 (11th Cir. 2008)("Most courts reviewing this issue have expanded Buie beyond in-home arrests pursuant to a warrant to all situations wherein officers are lawfully present in a home."); United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005)("Other circuits have applied Buie to non-arrest situations but only under the second prong of Buie, which requires a showing of a reasonable suspicion of dangerous individuals in the house."); United States v. Crisolis-Gonzalez, 2012 WL 71019, *2 (W.D. Mo. Jan. 10, 2012)("[S]o long as the officers' presence is lawful, the reason for their presence is irrelevant, and in this case the officers' presence was lawful based on … consent.") Given Julio Gastelum-Castro's consent for officers to enter the residence, the officers were lawfully present in the home.

Next, the Court must analyze whether the officers possessed a reasonable suspicion that their safety was at risk to justify a protective sweep. The purpose of the knock and talk was to investigate information received that Mexican males who might be in the United States illegally were involved in a shipment of illegal narcotics. The subjects who were approached were Spanish speakers which was consistent with the information provided by the confidential informant. One of these subjects was found to be in possession of cocaine. Given the circumstances, a reasonable officer could conclude that it was necessary for his safety to secure the premises. There was a reasonable possibility that other individuals were in the home, posing a danger to the officers. See United States v. Cash, 378 F.3d 745, 749 (8th Cir. 2004)("an officer

arresting a suspected drug trafficker in one room of a multi-room residence is justified in conducting a Buie sweep out of concern that there could be individuals lurking in the other rooms who may resort to violence to thwart the arrest"); United States v. Horne, 4 F.3d 579, 586 (8th Cir. 1993)(upholding a Buie sweep because "[w]hen the law enforcement officers entered the house …, they had no way of knowing how many people were there").

The protective sweep was conducted quickly (the three subjects had come out of the house at approximately 3:25 p.m.,[10] permission to enter the residence was requested and provided by Julio Gastelum-Castro,[11] the protective sweep was begun,[12] Luis Gastelum-Castro was discovered sleeping in the basement and was brought out of the residence,[13] a consent to search form was read to Julio Gastelum-Castro and Luis Gastelum-Castro and the consent to search form was signed by Julio Gastelum-Castro and Luis Gastelum-Castro at 3:30 p.m.,[14] all occurring in a mere five minutes). Once it was determined that no one (besides Luis Gastelum-Castro) was in the house, the officers retreated from the house and obtained consents to search before searching the residence further. (See Fact No. 7, supra) The Court finds that the officers conducted a quick and limited search for the purpose of officer safety. The protective sweep was valid.

C.     Consent to Search

"Under the Fourth Amendment, 'searches and seizures inside a home without a warrant are presumptively unreasonable.'" United States v. Comstock, 531 F.3d 667, 675 (8th Cir. 2008) (quoting Payton v. New York, 445 U.S. 573, 586 (1980)). "Equally fundamental, however, is the

---

[10](See Fact No. 3, supra)
[11](See Fact No. 3, supra)
[12](See Fact No. 6, supra)
[13](See Fact No. 6, supra)
[14](See Fact No. 7, supra)

13

principle that a warrantless search of a residence does not violate the Fourth Amendment where police obtain a resident's consent." Comstock, 531 F.3d at 675 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

Following the protective sweep of the residence, the officers decided to seek consent to search the residence from both Julio Gastelum-Castro, because he had indicated that it was his residence, and Luis Gastelum-Castro, because he had been found asleep in the basement room where narcotics had been observed in plain view during the protective sweep. (See Fact Nos. 6 and 7) Both Julio Gastelum-Castro and Luis Gastelum-Castro provided written consent.

The government bears the burden of proving that consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In United States v. Willie, the court set forth the following guidance in judging the voluntariness of a consent to search:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

Detective Cerda, who is fluent in the Spanish language, presented a written consent to search form to Julio Gastelum-Castro and Luis Gastelum-Castro. (See Fact No. 7, supra) Detective Cerda read the consent form, which was written in Spanish, to Julio Gastelum-Castro and Luis Gastelum-Castro. (Id.) Neither Julio Gastelum-Castro nor Luis Gastelum-Castro asked any questions about the consent form. (Id.) Neither Julio Gastelum-Castro nor Luis Gastelum-Castro indicated to Detective Cerda that they did not understand the form or what Cerda was requesting. (Id.) Both Julio Gastelum-Castro and Luis Gastelum-Castro signed the consent to search form. (Id.) No evidence was presented to indicate that Julio Gastelum-Castro or Luis Gastelum-Castro were under the influence of alcohol or drugs. No evidence was presented to indicate that Julio Gastelum-Castro or Luis Gastelum-Castro were threatened nor that they were made any promises to secure their consent. No evidence was presented to indicate that Julio Gastelum-Castro or Luis Gastelum-Castro made any objections while the officers were searching the residence. At the time of the search, Julio Gastelum-Castro was 36 years old and Luis Gastelum-Castro was 26 years old. (See Indictment (doc #8)) Julio Gastelum-Castro and Luis Gastelum-Castro signed the consent form at 3:30 p.m., just five minutes after the officers initially approached Julio Gastelum-Castro, Daniel Perez and Andres Martinez-Lopez. (See Fact Nos. 3, 4 and 7, supra) Julio Gastelum-Castro and Luis Gastelum-Castro were detained,[15] but not under arrest when they signed the consent to search form. (See Fact No. 7, supra)

Based on the evidence outlined above, the Court finds that both Julio Gastelum-Castro and Luis Gastelum-Castro voluntarily consented to a search of the residence. The government has

---

[15]"But being handcuffed 'does not preclude a finding of voluntariness.'" United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008)(quoting United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003)). See also United States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990)("even persons who have been arrested and are in custody can voluntarily consent to a search").

met its burden in establishing that the consents to search were freely and voluntarily given and not the result of duress or coercion.

D. Electronic Data

In response to defendant's motion to suppress electronic data, the government stated:

> The government has not searched the electronic media that was recovered from the defendant's cell phone, nor does the government intend to use it as evidence against the defendant at trial. As such, the government does not oppose the defendant's motion to suppress the electronic media.

(Government's Response in Opposition to Defendant Luis Gastelum-Castro's Motion to Suppress Evidence Seized on October 5, 2010 (doc #36) at 14)

Given the government's response, that portion of defendant's motion which seeks suppression of electronic data will be granted.

E. Federal and State Officers

Special Agent King, a special agent with Immigration and Customs Enforcement, Homeland Security Investigations, testified that he is assigned to the Kansas City, Missouri Police Department Gang Squad and worked with the Kansas City, Missouri Police Department on this case. (See Fact Nos. 1 and 7, supra)

Defendant argues that because the Kansas City, Missouri Police Department worked as a team with federal agents from the Immigration and Customs Enforcement, Homeland Security Investigations, the search and seizure was tainted beyond repair. (Supplemental Declaration and Memorandum in Support of Motion to Suppress (doc #54) at 2-3) Defendant provided no case law or other authority to support his position.

The Court notes that many of the cases before this Court have involved local police officers who have been assigned to federal agencies or, as in this case, federal officers who have been

16

assigned to local police departments. The Court is aware of nothing that would make such arrangements improper. Thus, defendant's argument fails.

F. Statements

Finally, while defendant's motion seeks suppression of statements, defendant does not make any specific arguments with respect to the suppression of statements. To the extent that defendant is arguing that statements must be suppressed as fruit of the poisonous tree, this argument must also fail as no constitutional violation occurred with respect to the search of the residence and the resulting arrests.

IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting in part and denying in part defendant Luis Gastelum-Castro's Motion for Suppression of Evidence Statements Waivers and Electronic Data (doc #32). It is recommended that the motion be granted to the extent it seeks suppression of electronic data from defendant's cell phone and that the remainder of the motion be denied.

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

            */s/ Sarah W. Hays*
            SARAH W. HAYS
         UNITED STATES MAGISTRATE JUDGE